UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD F. CHORMANN,

    Plaintiff,

v.

PNC FINANCIAL SERVICES GROUP, INC.,

    Defendant.
_____/

CASE NO. 1:11-cv-555

HON. ROBERT HOLMES BELL

## **O P I N I O N**

This matter is before the Court on Defendant's motion to dismiss Plaintiff's amended complaint. For the reasons that follow, Defendant's motion will be granted in part.

### I.

Plaintiff Richard Chormann worked as President and Chief Operating Officer of First of America Bank Corporation ("FOA") from 1986 through 1996, and as Chairman of the Board of FOA from 1996 until the acquisition of FOA by National City Corporation ("NCC") in 1997. During the acquisition of FOA by NCC, Plaintiff and NCC reached an employment agreement governing his continued employment and eventual retirement. Defendant PNC Financial Services Group, Inc. ("PNC") acquired NCC in 2008, thereby assuming the liabilities of FOA and NCC, including the

1

employment agreement with Plaintiff. For simplicity, all three will be referred to as "Defendant."

Under the heading "Retirement and Death Benefits," the employment agreement contains a provision stating:

> If not provided by FOA before the Effective Date, the Company shall provide the Executive with a life insurance policy on his life with a death benefit of $10,000,000 pursuant to a split-dollar arrangement providing for an initial one-time premium not to exceed $3.8 million.

(Dkt. No. 11, Ex. A ¶ 5(v).) Defendant's obligations under this split-dollar arrangement are the subject of Plaintiff's lawsuit.[1]

Defendant agreed to pay an initial premium of approximately $3.7 million to purchase two life insurance policies held in trust by FOA bank. Because the initial lump premium is invested and is expected to produce growth, the plan is designed to provide reimbursement for premiums paid by Defendant without reducing the agreed $10 million death benefit to Plaintiff's heirs.

The dispute in this case arose concerning taxes owed on the insurance policy. In a collateral assignment split-dollar arrangement such as this, an employee is taxed on the "economic benefit" of the insurance arrangement, which is calculated using the lower of

---

[1] A split-dollar life insurance arrangement is used, in part, to secure life insurance at reduced or no cost to an employee and to allow the passage of assets to the insured's heirs outside of the insured's taxable estate. (Dkt. No. 11 at ¶ 17.) An employer contracts with its employee to pay some or all of the annual premiums on a whole life insurance policy for the employee, and the employer and employee split the policy benefits. (Dkt. No. 19 at 4). Generally, the employer receives from the insurance disbursement an amount equal to the premiums paid in support of the policy, with the remaining death benefit going to the insured's beneficiaries.

either the insurer's rate or rates from the IRS PS-58 table.  (Dkt. No. 19 at 5; Dkt. No. 25 at 5.)[2]  This tax consequence generally increases with the insured's age.  (Dkt. No. 11 at ¶ 27.)  Because of this, split-dollar arrangements sometimes include an obligation on the employer to reimburse employees for these tax consequences.  (*Id.* at ¶ 29.)  The tax reimbursement is called a "gross-up."  Plaintiff claims that the present split-dollar arrangement includes such a feature.  (*Id.*)

Plaintiff alleges that Defendant included a tax gross-up in payments to Plaintiff in 1997.  (*Id.* at ¶ 42).  Plaintiff is unable to determine whether Defendant included gross-ups for 1998 or 1999, (*Id.* at ¶ 43), but asserts Defendant has not reimbursed him for income tax related to the split-dollar insurance from 2000 to present.

Plaintiff did not file the present action until 2011.  He maintains that he was ignorant of Defendant's failure to provide a gross-up because: (1) Defendant did not explicitly repudiate its obligation to pay a gross-up; (2) the W-2 form provided by Defendant lumped various forms of compensation into a "deemed income" sum, thus making it impossible to determine whether a gross-up was being paid; and (3) the amount of the gross-up, despite being in excess of $10,000 annually, was too minuscule compared to Plaintiff's total compensation to be easily noticed.[3]

---

[2] For example, if the applicable rate were $1.50 per thousand dollars of insurance, Plaintiff's imputed income would be $15,000.  (1.5/1000 x 10,000,000).  The $15,000 of imputed income would be added to Plaintiff's total income and taxed at the applicable rate.

[3] From 1999 through 2010, Plaintiff's annual compensation from Defendant was as much as $13 million.  (Dkt. No. 25 at 8.)

Plaintiff was alerted to Defendant's cessation of gross-up payments in 2009 when Defendant, acting as an employer, sought to collect from Plaintiff taxes on the imputed income deriving from the split-dollar insurance policies. (Dkt. No. 25 at 9.) Plaintiff then took the position that Defendant was obligated to pay all taxes in connection with the split-dollar insurance policies, and sent a demand letter for reimbursement "for the federal and state taxes on approximately $214,000 of deemed income" paid by Plaintiff since 2000. (*Id.*) Defendant declined to pay, stating that it found nothing in the split-dollar agreement obligating it to pay Plaintiff's taxes on the insurance policies. Plaintiff filed suit in May of 2011.

## II.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In reviewing the motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)).

## III.

Plaintiff initially brought this suit purely as a breach of contract action. However, in response to Defendant's position that the split-dollar life insurance benefit constitutes

an employee benefit plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), Plaintiff filed an Amended Complaint which includes counts under both state law and ERISA.  (Dkt. No. 11).  Because ERISA's "broad preemption provision . . . 'supercedes any and all State laws insofar as they may now or hereafter relate to any employee benefit plan,'" *Muse v. IBM Corp.*, 103 F.3d 490, 495 (6th Cir. 1996) (quoting 29 U.S.C. § 1144(a)), Plaintiff's ERISA and state law claims must be viewed as plead in the alternative.

**A.  The Employee Agreement Does Not Constitute an ERISA-Governed Plan**

"The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 434 (1996); *accord Langley*, 502 F.3d at 479.  Under Sixth Circuit precedent, a plan is governed by ERISA if: (1) it does not fall within the scope of safe-harbor regulations exempting certain practices from ERISA's coverage, *see* 20 C.F.R. § 2501.3-1; (2) a reasonable person is able to ascertain the intended benefits, beneficiaries, the source of financing and the procedures for receiving benefits; and (3) the employer "established or maintained" the plan with the intent of providing benefits to its employees.  *Langley*, 502 F.3d at 479; *Thompson*, 95 F.3d at 434-35.

Defendant maintains that the portion of the employment agreement incorporating the split-dollar life insurance agreements along with the split-dollar life insurance agreements constitute an ERISA plan under the *Thompson* test.  Defendant argues that

5

the agreements do not fall within a "safe-harbor," that the benefits and beneficiaries of the plan are clear, and that Plaintiff's allegation that the Defendants must pay annual gross-ups shows that Defendant must maintain the plan.

Plaintiff argues that the employment agreement does not satisfy the third prong of the ERISA plan inquiry. Whether or not an employer "established or maintained" an ERISA-governed plan is dependent on whether the employer established an administrative scheme for the implementation of the plan. As the Supreme Court explained in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1987):

> Congress intended [ERISA] preemption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted state laws relating to *plans*, rather than simply to *benefits*. Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

*Id.* at 11-12; *accord Kolkowski v. Goodrich Corp.*, 448 F.3d 843 (6th Cir. 2006) ("In order to distinguish an ERISA from a non-ERISA plan, we must look to the nature of the plan itself. The hallmark of an ERISA benefit plan is that it requires an ongoing administrative program to meet the employer's obligation.") (citations and internal quotation marks omitted). Administrative schemes are necessary to adminster plans which require the exercise of discretion in the granting or calculation of claims:

> In determining whether an ERISA plan exists, the pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an

6

> administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Sherrod v. Gen. Motors Corp.*, 33 F.3d 636 (6th Cir. 1994) (citations and internal quotation marks omitted).

The Court finds that Defendant's obligations under the employment contract with Plaintiff do not necessitate the creation of an administrative scheme.  The employment contract merely obligated Defendant to fund the purchase of the insurance policies with an initial payment not to exede $3.8 million.  (Dkt. No. 25 at 13.)  While Plaintiff does claim that the split-dollar agreements obligate Defendant to make annual payments in reimbursement for tax costs, these payments merely require a "mechanical calculation" of Plaintiff's tax obligation, and therefore do not require an ongoing administrative scheme.  Accordingly, Defendant's preemption defense against Plaintiff's state law claims fails, and Plaintiff's ERISA-based claims (Counts III-VII) will be dismissed.

**B.  Plaintiff's State Law Claims**

Michigan has a six-year statute of limitations for breach of contract.  Mich. Comp. Laws § 600.5807(8).  Delaware law, which could argably apply to the employment contract, is more restrictive with a three-year statute of limitations.  Del. Code Ann. tit. 10 § 8106.  Plaintiff's amended complaint alleges that Defendant had stopped paying gross-up reimbursements by 2000 at the latest, and Plaintiff did not file this action until 2011.  Thus, Defendant argues that Plaintiff's breach of contract claim (Count I) is time-barred under either statute.

Plaintiff maintains that his breach of contract claim is not time barred because each of Defendant's failures to pay an annual gross-up should be regarded as a separate breach of contract.  For support, Plaintiff turns to Michigan law on installment contracts, which holds that each failure to make periodic payments under an installment contract constitutes a separate breach.  *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.*, 234 Mich. App. 550, 562-63 (1999).  Plaintiff cites *Adams v. City of Detroit*, 232 Mich. App. 701 (1998) for the proposition that law governing installment contracts should apply here.  In that case, the Michigan Court of Appeals found that an employer's failure to pay insurance premiums could be considered separate breaches of contract.  At oral argument, Plaintiff also referenced the Supreme Court's decision in *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of CA, Inc.*, 522 U.S. 192 (1997), which held that missed withdrawal liability payments under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461 ("MPPAA") constitute separate breaches of contract.

In response, Defendant relies on this Court's prior decision in *Auto-Owners Ins. Co. v. Edward D. Jones & Co. Employee Health & Welfare Program*, 759 F. Supp. 2d 895 (W.D. Mich. 2010), which held that a defendant's successive failures to pay a series of medical bills pertaining to a single accident should not be considered as separate breaches when the denials were all based on defendant's initial determination that it was a secondary insurer.  *Id.* at 902-03.  However, *Auto-Owners* is distinguishable from the present case because it did not feature an installment contract; the case may have

involved multiple claims, but there was no alleged contractual aggrement to make regular payments.

The Court finds that dismissal on statute of limitations grounds would be innapropriate at this stage of the litigation. Plaintiff has alleged that an agreement akin to an installment contract obligated Defendant to make annual gross-up payments to Plaintiff. Plaintiff has also provided legal support for his position that, under Michigan law, each of the unpaid gross-ups should be considered a separate breach. Drawing all reasonable inferences in favor of Plaintiff, the Court will deny Defendant's motion to dismiss Count I of Plaintiff's amended complaint.[4]

Defendant's motion to dismiss Plaintiff's declaratory judgment claim will also be denied. As Defendant points out, the requested relief of declaratory judgment requiring Defendant to pay "taxes, penalties and interest" stemming from the split-dollar arrangement is predicated on Plaintiff's breach of contract claim. Thus, if Plaintiff's breach of contract claim is time-barred, so too is that aspect of his declaratory judgment claim. *See Int'l Ass'n of Machinists & Aerospace Workers v. Tennessee Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997) ("A request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred. . . . A contrary rule would allow a plaintiff to 'mak[e] a mockery of the statute of limitations by the simple expedient of creative labeling.'") (internal citations omitted); *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 863 (Mich. App. 2008) ("when the statute of

---

[4] Of Course, Defendant will remain free to make statute of limitations arguments as appropriate at later points in this litigation.

limitations would bar granting relief on the underlying substantive claim, it also bars the same claim when stated as one seeking declaratory relief."). Conversely, as the Court has declined to dismiss Plaintiff's breach of contract claim, Plaintiff's declaratory judgment claim also survives.

## IV.

The Court finds that the employment agreement and split-dollar agreements which are the subject of this dispute do not constitute an ERISA plan. Accordingly, Plaintiff's ERISA claims (Counts III-VII) will be dismissed. The Count also finds that, after taking all inferences in favor of Plaintiff, Plaintiff's state law claims should not be dismissed as time-barred. An order consistent with this opinion will be entered.

Dated:  January 13, 2012                    /s/ Robert Holmes Bell
                                                                ROBERT HOLMES BELL
                                                                UNITED STATES DISTRICT JUDGE